IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Wencoast Restaurants, Inc. and | ) | |
| Marshall W. Criss, | ) | |
| | ) | |
| Plaintiffs, | ) | C/A No. 2:05-1650-18 |
| | ) | |
| vs. | ) | |
| | ) | |
| Chart Capital Partners, L.P.; Chart Capital | ) | |
| Associates, LLC; Chart Group L.P.; | ) | |
| Wencoast Holdings LLC; H. Whitney | ) | |
| Wagner; David Collier, and Chris Brady, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| Wencoast Restaurants, Inc., | ) | |
| | ) | C/A No. 2:05-1651-18 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER and OPINION** |
| Marshall W. Criss and Thomas Powell, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    FACTUAL BACKGROUND

Before the court are several motions relating to control and ownership of

Wencoast Restaurants, Inc. ("Wencoast"), an entity that owns or leases several Wendy's

Restaurants in the southeast.  Both Marshall Criss ("Criss") and Chart Capital Partners,

LP ("Chart LP") claim rightful control over Wencoast, and the parties have initiated

separate actions pursuant to their claims.  Both parties have filed the actions in the name

of Wencoast.

In 2000, Wencoast began negotiations with Wendy's International, Inc. regarding

franchise rights and restaurant sales.  At that time, Criss was the sole Wencoast

shareholder.  On November 6, 2000, Wencoast, Criss and Chart LP signed an

"Agreement and Consent to Agreement" ("Wendy's Agreement"); Wendy's signed on

November 20.  On November 9, 2000 Wencoast filed an amended and restated Articles

of Incorporation and Bylaws.  The following day, Chart LP purchased shares in

Wencoast and entered into a Shareholder's Agreement with Criss.  Since Chart LP's

original investment is ninety times that of Criss ($4,500,000 to $50,000), Criss, Chart LP

and Wencoast entered into a Voting Agreement effective November 10, 2000, requiring

Criss to vote for two directors nominated by Chart LP.  Also on November 10, 2000,

Criss and Chart LP signed a Call Option Agreement.

Wencoast's class A shareholders currently include Criss (51%) and Chart LP

(49%).[1]  Wencoast Holdings, LLC ("Holdings LLC") holds 100% of the class B shares.

Prior to June 6, 2005 the Board of Directors included two Chart LP representatives

(David Collier and H. Whitney Wagner) and Criss.  Due to the Voting Agreement, Chart

LP controls the Board despite being the minority shareholder.  In a June 6, 2005

Directors meeting, a majority of the Board voted to remove Criss as director, president

and secretary, and to terminate his employment.  Thomas Powell (Criss's stepson) was

also terminated as an employee.  Upon Criss's termination, Chart LP attempted to

execute its option to purchase Criss's shares pursuant to the Call Option Agreement.  At

that same meeting, the Board elected Martin Ettlemeyer president.

---

[1] Chart Capital Associates, LLC ("CCA") is the general partner of Chart LP.  The
Chart Group controls CCA.  Collier, Wagner and Brady are involved in varying degrees
with the Chart business enterprises.

Criss contends that the Board lacks the power to terminate him.  After the putative termination, Criss took a variety of actions to assert control over Wencoast, including re-instating his benefits, declaring himself managing director, and re-hiring personnel.  Additional relevant facts are discussed below.

Chart LP then initiated action 05-1650 against Criss and Thomas Powell, later amended to include tortuous interference with contracts and prospective contractual relations, violation of the computer fraud and abuse act, conversion, trespass, ultra vires, quo warranto, breach of duty, and breach of fiduciary duty.  Subsequently, Chart LP filed a motion to dismiss Criss's complaint (see infra), a motion to show cause and three summary judgment motions.

Soon after Chart LP filed its complaint, Criss initiated action 05-1651 against Chart LP, CCA, Chart Group, Holdings LLC, Wagner, Collier and Chris Brady.  The amended complaint of July 15, 2005 alleges derivative claims, in part, for tortuous interference with contractual rights, breach of fiduciary duty, and wrongful termination. Criss subsequently filed three preliminary injunction requests and two motions for summary judgment.[2]

On June 14, 2005, Judge Blatt issued a temporary restraining order and preliminary injunction ordering that Criss be reinstated to the Board, that the decision to call Criss's stock be vacated, that Criss's termination as an officer and employee remain in effect, and that the Board elect a new president and secretary.  Judge Blatt ordered that

---

[2] One of these requests, document no. 28 in 05-1651, was subsequently withdrawn.  The remaining two were denied in previous orders.

the new president and secretary must be either Criss, a member of the Board, or someone

with five years experience in the food service industry.  The order also stated that all

members of the Board were to have equal access to Wencoast's corporate files,

documents, and computer servers.  Following Judge Blatt's order, Collier was elected

president.

On July 11, 2005, this court denied Criss's initial motion for a preliminary

injunction.  On October 12, 2005, this court denied Criss's second preliminary injunction

request and Chart's motion to show cause.  The remaining motions reflect the three issues

in dispute: control of Wencoast, the availability of Criss's Termination Call Option, and

the applicability of Chart's Call Option.  Also before the court is Chart's motion to

dismiss Criss's allegations in 05-1650.

## II.      DISCUSSION

### a.       Chart's motion to dismiss

#### i.        Derivative Action

The Chart defendants contend that Criss has failed to adequately allege the

required elements of a derivative claim under Fed. R. Civ. P. 23.1, which requires, in

part:

> the complaint [to] allege with particularity the efforts, if any, made by the
> plaintiff to obtain the action the plaintiff desires from the directors or
> comparable authority and, if necessary, from the shareholders or members,
> and the reasons for the plaintiff's failure to obtain the action or for not
> making the effort.

Fed. R. Civ. P. 23.1.  The pertinent part of Criss's complaint states

> Criss has demanded of the controlling members of the board of directors
> that they take the actions requested in this Complaint through counsel and

4

> through court proceedings, as well as through demand in a duly noticed
> and constituted shareholders' meeting, that the members of the board of
> directors not take any action that is sought to be remedied in this lawsuit.
> Furthermore, the actions of the members of the board of directors and their
> resistance to suggestions by Criss indicate that any further attempts would
> be futile.

Criss's Amended Complaint ¶ 9.  Criss contends both that he made an effort to get the

outcome he desired, and that any further action would be futile.  Chart argues that Criss's

amended complaint does not state with particularity either the efforts to obtain the

desired result, or the reason for the failure to do so.

Federal courts sitting in diversity jurisdiction must look to the substantive law of

the state of incorporation to determine how a derivative claim must be stated.  Rule 23.1

only requires that "plaintiff allege with particularity the demands they have made, if any,

or their reasons for not making [a] demand." Salit v. Stanley Works, 802 F. Supp. 728,

737 (D. Conn. 1992). Therefore, the issue in contention - whether the demand and/or

excuse was stated with particularity - is a federal procedural question.  Similarly, whether

plaintiff has a sufficient excuse not to make a demand is a state law issue, with the caveat

imposed by the federal rules that it be stated with particularity.  "Federal law controls in

determining whether the allegations of the complaint are particular enough, while state

substantive law determines whether the reasons offered by plaintiff for excusing demand

are adequate."  Geer v. Cox, 242 F. Supp. 2d 1009, 1019 (D. Kan. 2003) (citing Kamen

v. Kemper Financial, 500 U.S. 90 (1991)).  In other words, the inquiry is whether

plaintiff's complaint "states with particularity (federal procedural requirement under Rule

23.1) facts which would excuse a demand upon the directors as futile under corporate law

5

(state substantive law)."[3]  Starrels v. First Nat. Bank of Chicago, 870 F.2d 1168, 1170

(7th Cir. 1989).  Chart challenges the "particularity" of Criss's demand, and alternatively,

his excuse for lack of demand.

Generally speaking, the particularity determination is made on a case-by-case

basis.  4 Wright & Miller, Federal Practice and Procedure § 1831 (2005).  Since the

rule's demand requirement is designed to give the directors an opportunity to take the

action requested by the shareholder prior to suit, a post-suit demand likely would not

suffice.  Id.  Accordingly, most of the evidence of Criss's post-suit demands is

irrelevant.[4]  However, Criss pleads futility with sufficient particularity.  Paragraph 16 of

Criss's complaint states that

> The Board of Directors took action to remove Criss as the President and
> Director of Wencoast on June 6, 2005, and on the same date, Chart
> notified Criss that they were exercising their rights under that certain Call
> Option Agreement dated November 10, 2000, to transfer ownership of
> Criss's shares of stock in Wencoast to Chart.

Complaint at 16.  It would be futile for Criss to make a demand on the Chart shareholders

since they are the putative wrongdoers.  Combined, paragraphs 9 and 16 state with

---

[3] The substantive law of the state of incorporation applies as to the latter question, even in federal diversity suits.  Kamen, 500 U.S. at 96-97.  See also McCall v. Scott, 239 F.3d 808, 815 (6th Cir. 2001).  Since Wencoast is incorporated in South Carolina, the law of this state applies.

South Carolina case law excuses a demand in a derivative suit if such a demand would be futile because the parties who could take corrective action (majority shareholders) are the alleged wrongdoers.  See Grant v. Gosnell, 266 S.C. 372, 376 (1976); Stahn v. Catawba Mills, 53 S.C. 519 (1898).  "In evaluating the 'excuse' allegations in derivative suits, courts have generally been lenient in excusing demand."  Grant, 266 S.C. 376.

[4] Criss's complaint suggests he has made demands through his counsel, court proceedings and subsequent shareholder meetings.

sufficient particularity the reasons for the failure to make a sufficient demand.  Given the

court's discretion in this matter and the general preference for adjudication on the merits,

this is the preferred outcome.  Chart's motion to dismiss the derivative claim is denied.

### ii.    Tortuous Interference with Contractual Rights

Criss contends that Chart LP forced the breach of several agreements between

Criss and Wencoast, including the Wendy's Agreement and various loan agreements.

Criss contends that Chart LP compelled a breach of the Wendy's Agreement;

specifically, the "control provision" which putatively states that all operating decisions

must be made by a majority of shareholders.

The Chart defendants suggest this claim should be dismissed because the

defendants are parties to the Wendy's Agreement.  "An action for tortuous interference

protects the property rights of the parties to a contract against unlawful interference by

third parties.  Therefore, it does not protect a party to a contract from actions of the other

party."  Threlkeld v. Christoph, 280 S.C. 225, 227 (Ct. App. 1984) (emphasis added).

Criss contends that defendants are not subject to the contract because the control

provision refers only to Criss and Wencoast.[5]  However, the first paragraph of the

Wendy's Agreement states "[t]his Agreement and Consent to Agreement is made . . . by

and among Wendy's . . . Criss . . . Wencoast . . . Chart Capital Partners, LP, Chart Capital

Associates, LLC, Chris Brady . . . ."  Chart LP, CCA, and Brady signed the Wendy's

Agreement as guarantors.  All of these entities are parties to the contract.  As such, this

---

[5] The control provision states that "Franchisees warrant, represent and agree . . . ."
Franchisees refer to Wencoast and Criss.

claim cannot lie against Chart LP, CCA, or Brady.

Agents and employees of a corporation cannot interfere with that corporation's contracts, since the corporation can only act through its agents and employees. Threlkeld v. Christoph, 280 S.C. 225, 227 (Ct. App. 1984). Collier is named as a member of Chart LP's investment committee, an officer of Holdings LLC, an officer of Wencoast, a board member of Wencoast, and as an employee of the Chart Group. All of these parties except Holdings LLC and Chart Group are signatories to the contract. Since Wagner is named as a Wencoast board member, he cannot interfere with his own company's contract. Wagner is also named as a member of the Chart Group's investment committee. Therefore, this action can lie against defendants Holdings LLC, Chart Group, Collier (as a Holdings LLC officer or Chart Group employee) or Wagner (as a member of the Chart Group's investment committee). The motion to dismiss this claim as to Chart LP, CCA and Brady is granted.

### ii.        Breach of Fiduciary Duty

The Chart defendants do not challenge Criss's ability to bring this claim against directors Collier and Wagner in his capacity as a shareholder. Criss also maintains the "other defendants" owe him a fiduciary duty "by virtue of the relationships of the parties." (Compl. ¶ 35.) It is doubtful that Criss can allege the directors owed him a fiduciary duty in his capacity as an officer of Wencoast, since no such duty runs from directors to officers. Chart LP argues it owes no duty towards Criss because the minority shareholder typically owes no duty to the majority shareholder. However, the existence of a fiduciary relationship is an equitable issue; such a relationship exists when one has

8

"special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith." Pittman v. Grand Strand Entertainment, 363 S.C. 531, 537 (2005). While Chart LP is the minority shareholder, it represents a majority of the Board by virtue of the Voting Agreement. Equity would suggest that this arrangement could possibly impose a fiduciary duty on Chart LP towards Criss. Therefore, this claim can stand as against Chart LP.

Criss does not specify why the remaining defendants - CCA, Chart Group, Holdings LLC, or Brady - owe him a fiduciary duty, other to say that "all defendants" are the controlling shareholder. Only Chart LP is the controlling shareholder. Criss implicitly suggests equity would extend the duty to Chart LP's general partner (CCA), and that entity's owner (Chart Group). Since these entities are so intertwined, such an inference is feasible. Equity gives Criss the benefit of the doubt, at least on a motion to dismiss. However, the class B shareholder (Holdings LLC) does not owe a duty to Criss. Brady is named as an employee of the Chart Group and as a member of Chart LP's investment committee. The court can not exclude the possibility that Brady's capacity in either entity precludes any duty towards Criss.

The motion to dismiss this claim is granted as against Holdings LLC only.

### iii.    Injunctive Relief

This court has twice denied Criss's motion for a preliminary injunction relating to the operational control of Wencoast. As a practical matter, injunctive relief may be the method to effect the court's ultimate ruling on the operation control issue. Therefore, Chart's motion to dismiss this request is denied.

### iv.     Wrongful Termination

This claim is a subsidiary of the larger control question.  The Chart defendants

contend Criss's termination as an officer was valid because the Bylaws state he is an at-

will employee.  Criss contends other corporate documents give him operational control of

Wencoast, and therefore, the Board lacks the power to terminate him.  The wrongful

termination claim will follow the resolution of the corporate governance issue.  For the

reasons stated below, Chart LP's motion to dismiss Criss's wrongful termination claim is

denied.

### b.     Operational Control

Both parties seek a favorable interpretation of section 1(E) of the Wendy's

Agreement (the "control provision"), which states

> Franchisees warrant, represent and agree that 1) all operating decisions to
> be made by the Corporation (except for the decision to sell all or
> substantially all of the assets, make distributions to shareholders, or
> modify the compensation of Criss) shall require only a simple majority
> vote (greater than 50%) of the shareholders . . . .

Of the three Wencoast shareholders, two (Criss and Chart LP) signed the Wendy's

Agreement; Holdings LLC did not.  However, all of the shareholders signed the

Shareholder Agreement.  The Shareholder Agreement references the Wendy's Agreement

three times.  Under "Transfer Restrictions on Shares," it reads:

> Reference is hereby made to that certain Wendy's International,
> Inc. Agreement and Consent to Assignment and those Wendy's
> International, Inc. Unit Franchise Agreements which it controls
> (collectively, the "Wendy's Agreements").  Shareholders acknowledge
> that all transfers of the shares are subject to Wendy's International, Inc.
> ("Wendy's") rights of first refusal and other restrictions set forth in the
> Wendy's Agreements.

Shareholder Agreement § 2(c).  The Shareholder Agreement also states:

> "Transaction Documents" shall mean this [Shareholder] Agreement, the
> Agreement and Consent to Assignment [Wendy's Agreement] and the
> Unit Franchise Agreements which are controlled by such Agreement and
> Consent to Assignment.

Shareholder Agreement § 6(d).  Finally, the Shareholder's Agreement states

what must appear on Wencoast's stock certificates:

> THE TRANSFER OF OWNERSHIP OF SHARES REPRESENTED BY
> THIS CERTIFICATE IS SUBJECT TO THE TERMS AND
> CONDITIONS OF AN AGREEMENT AND CONSENT TO
> ASSIGNMENT WITH WENDY'S INTERNATIONAL, INC. DATED
> AS SET FORTH THEREIN.  REFERENCE IS MADE TO THE
> PROVISIONS OF SAID ASSIGNMENT, THE UNIT FRANCHISE
> AGREEMENTS WHICH IT CONTROLS AND TO THE ARTICLES OF
> THIS COMPANY.
>      THE SALE, ENCUMBRANCE OR OTHER DISPOSITION OF
> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE
> SUBJECT TO THE PROVISIONS OF A SHAREHOLDER
> AGREEMENT TO WHICH THE ISSUER AND CERTAIN OF ITS
> SECURITYHOLDERS ARE PARTY, A COPY OF WHICH MAY BE
> INSPECTED AT THE PRINCIPAL OFFICER OF THE ISSUER OR
> OBTAINED FROM THE ISSUER WITHOUT CHARGE.
>      THE SECURITIES REPRESENTED BY THIS CERTIFICATE
> WERE ISSUED IN A PRIVATE PLACEMENT, WITHOUT
> REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS
> AMENDED (THE "ACT"), AND MAY NOT BE SOLD, ASSIGNED,
> PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF
> AN EFFECTIVE REGISTRATION UNDER THE ACT COVERING
> THE TRANSFER OR AN OPINION OF COUNSEL, SATISFACTORY
> TO THE ISSUER, THAT REGISTRATION UNDER THE ACT IS NOT
> REQUIRED.

Shareholder Agreement ¶ 10 (emphasis added).  Wencoast's stock certificates

contain this information.  The Articles of Incorporation contains one reference

to the Wendy's Agreement:

> 14.    Legend.  The certificates of capital stock transferred or issued shall

11

> be endorsed as follows:
> THE TRANSFER OF OWNERSHIP OF SHARES REPRESENTED BY
> THIS CERTIFICATE IS SUBJECT TO THE TERMS AND
> CONDITIONS OF AN <u>AGREEMENT AND CONSENT TO
> ASSIGNMENT</u> WITH WENDY'S INTERNATIONAL, INC. DATED
> AS SET FORTH THEREIN.  REFERENCE IS MADE TO THE
> PROVISIONS OF SAID ASSIGNMENT AGREEMENT, THE UNIT
> FRANCHISE AGREEMENTS WHICH IT CONTROLS AND TO THE
> ARTICLES OF THIS COMPANY.

Article of Incorporation ¶ 14 (emphasis added).

At issue is whether the combination of these documents amend the corporate

governance structure of Wencoast.  Criss contends the control provision gives him

operational control of the company as the majority shareholder.  The Chart defendants

contend the control provision does not meet the requisite statutory requirements.  The

parties fundamentally disagree over the application of S.C. Code Ann. § 33-8-101, which

provides:

> Unless otherwise provided in
> (a) Chapters 1 through 20 of this Title;
> (b) the articles of incorporation; or
> (c) an agreement unanimously approved by the shareholders and disclosed
> in the articles of incorporation and on the corporation's share certificates,
>
> all corporate powers must be exercised by or under the authority of, and
> the business and affairs of a corporation must be managed under the
> direction of, a board of directors.  If the authority of the board is dispensed
> with or limited by a provision in the articles of incorporation under (b) or
> by a shareholders agreement under (c), the articles or the agreement shall
> describe who is to perform some or all of the duties of a board of
> directors.

Therefore, § 8-101 permits a shareholder agreement to alter the Board's governance if (1)

an agreement unanimously approved by the shareholders is (2) disclosed in the articles of

incorporation and (3) is disclosed on the corporation's share certificates.  The first prong

is satisfied several ways.  Criss was the sole shareholder when he signed the Wendy's

Agreement on November 6, 2000.  On November 9, 2000, the Articles were amended to

authorize additional shares.  The Chart defendants purchased those shares on November

10, the same day the Shareholder Agreement was signed.  Therefore, the Wendy's

Agreement was unanimously approved by all of the then-existing shareholders.  The

Articles' reference to the Agreement put subsequent shareholders on notice of the

governance structure.  Most importantly, all the current shareholders approved the

Shareholder Agreement, which references the Wendy's Agreement.  As such, all of the

current shareholders (1) had notice of Wendy's Agreement, and (2) approved the

Shareholders Agreement which references the Wendy's Agreement.[6]

The share certificates reference both the Shareholder Agreement and Wendy's

Agreement, and therefore disclose the relevant information.  Finally, the Articles

reference the Wendy's Agreement.  Only the existence of the documents need be

disclosed.  S.C. Code Ann. § 33-8-101, cmt.  These requirements reflect the need to put

subsequent shareholders on notice of the unique provisions.  See id., cmt. (noting

previous statute permitting a Bylaw to limit board authority was "abandoned because

public notice is lacking").  In this instance, the Chart defendants had notice of the control

provision through three different documents.  As noted, the Wendy's Agreement was

unanimously approved by all of the then-existing shareholders on November 6, 2000.

The Articles reference that Agreement.  When new shares were authorized on November

---

[6] Chart contends the Wendy's Agreement was not operative until Wendy's signed
on November 20.  Section 33-8-101 only requires that the shareholders sign the
agreement altering corporate governance.

10, the subsequent shareholders were bound by the Articles.  As such, by virtue of the Articles alone Chart had constructive notice of the control provision.  The Share Certificates provide additional notice.  Finally, the Shareholder Agreement provides further notice of the Wendy's Agreement.

This interpretation of the control provision is strengthened after considering its relationship with the Call Option Agreement.  Chart LP contends it would never have agreed to hand operational control over to Criss, given that the former's investment is ninety times that of the latter.  However, the Call Option Agreement limits Criss's ability to significantly alter Wencoasts' operations.  Upon any one of twelve relatively broad events, Chart LP may purchase all of Criss's shares in Wencoast.  These events include a drop in Wencoast's Fixed Charges Coverage Ratio (a Wendy's performance measurement) below a certain level, an agreement to sell Wencoast shares or assets, Criss's attempt to sell his shares, or Criss's intentional falsification of corporate accounts, among other scenarios.  Application of the Call Option Agreement is discussed infra.  Its mere existence informs this present discussion, as the Call Option Agreement limits Criss's "operation control" of Wencoast.  Common sense suggests that Chart LP would seek a mechanism to protect its investment if someone else retained operational control. If anything significant occurs, Chart LP has the option to buy Criss out.  Interpreting the control provision in Criss's favor is not as draconian as Chart LP suggests.

For the reasons stated above, the court finds the Wendy's Agreement, specifically section 1(E), alters Wencoast's corporate governance pursuant to S.C. Code Ann.§ 33-1-808.  Criss's motion for summary judgment as to control of Wencoast is granted.

### c.       Termination Call Option

Criss's Termination Call Option, described in 6(a) of the Shareholder Agreement,

generally gives Criss the right to purchase Chart's shares in Wencoast "upon the

company's termination [of] Criss's employment."  However, Criss was not validly

terminated, and therefore cannot take advantage of this provision.  Termination of

officers is a fundamental operating decision, and operating decisions require a majority

shareholder vote.  The June 6, 2004 action to terminate Criss was not made by a majority

of the shareholders, and thus is void.  Therefore, Criss's Termination Call Option is not

available.  Criss's request for summary judgment validating his ability to purchase

Chart's shares through this option is denied.

### d.       Call Option Agreement

The Call Option Agreement provides:

(a)     Upon the occurrence of any event stated below in Section 1(b),
        (the "Events"), Chart may elect by giving Criss written notice
        thereof pursuant to Section 1(c) hereof, to purchase all or any of
        the Shares from Criss, and Criss shall be required to sell the Shares
        to Chart, in accordance with and subject to the terms hereof.  In
        consideration for the Shares purchased under this Call Option,
        Chart shall cancel the $500,000 Promissory Note dated as of the
        date hereof payable to the order of Wencoast Holdings, LLC, and
        executed by Criss as of the date hereof.

(b)     Events Precedent to Call Rights.  The following shall constitute
        "Events."
        . . . .
        5.     Chart or Wencoast receives an offer to purchase and agrees
               to sell the shares or assets, whether in whole or in part, of
               Wencoast; or Criss transfers or attempts to transfer the
               shares.

Call Option Agreement § 1(a)-(b).  On April 1, 2005, Wencoast sold over $7 million in

real estate and other assets to reduce debt and improve liquidity.  It subsequently leased

15

back some of these restaurants.  In an August 3, 2005 letter, Chart informed Criss of its

desire to exercise its call option as defined in § 1(a) and (b).

Criss advances several objections to Chart's exercise of the call option.  First, the

August 3, 2005 letter violates Judge Blatt's June 14 temporary restraining order

preventing Chart from calling Criss's shares.  Following the August letter, Chart labeled

the call attempt as "inadvertent" and filed a motion to amend Judge Blatt's order.  While

Chart should have been more careful, Judge Blatt's temporary restraining order is just

that - temporary - and will have to be amended for resolution of this dispute.  As such,

this contention cannot block Chart's call option.

Criss also contends the sale/leaseback is not a sale of the assets as contemplated

by  section 1(b)(5).  This argument is unavailing, as there is no reason to think this is not

a sale of assets.  Criss argues his attempted exercise of the termination call option via

letter on August 2, 2005 blocks Chart's attempt to call his shares.  The court need not

address this issue, as Criss's Termination Call Option is not available.

Criss suggests the sale is improper because it contends Wencoast initiated the

transaction.  Criss argues the language of the call option (Wencoast "receives an offer")

describes "an offer, independently initiated by a third party to purchase the shares or

assets or Wencoast or Chart."  (Criss mem. in opp., doc. no. 74, at 24.)  Criss apparently

suggests that Wencoast made the initial offer, and therefore the option is not available.

However, Criss's recitation of the facts regarding the transaction undermines his legal

argument:

> In 2000 General Electric Capital ("GE Capital) loaned Wencoast
> money to facilitate the acquisition of the original 24 Wendy's restaurants

> (this loan has a current unpaid balance of apparoximately $10.6 million).
> By 2004, GE Capital had made ten additional loans to Wencoast to
> provide financing for the land and building of two of the original 23
> restaurants and the development of 4 new restaurants.  In 2004, the unpaid
> principal balance on the 11 loans was in excess of $17 million.  GE
> Capital advised Wencoast in early 2004 that if its total outstanding loans
> could be reduced below $15 million dollars, they would buy back a 50%
> participation in the original acquisition loan that they had earlier sold to
> Fleet Finance and would reamortize the acquisition loan, lowering
> Wencoasts's debt service, and would waive any prior technical events of
> default in the loan for failure to meet financial covenants.

(Id. at 23.)  According to Criss, he then secured a company (Marcus Millichamp) willing

to make the sale/leaseback transaction.  He then approached GE Capital to discuss other

aspects of the debt reduction arrangement:

> In the fall of 2004, I discussed the terms of this [Marcus
> Millichamp] transaction with a representative of GE Capital, who
> suggested that GE Capital might be interested in handling this transaction
> on the same terms as Marcus Millichamp, and without the contingencies.
> Since it would simplify the transactions by only having to deal
> with one company on both the loan and the sale/leaseback transaction, and
> since the GE Capital terms were equal to, or better than, the Marcus terms,
> Chart and I agreed to enter into the sale/leaseback transaction with GE
> Capital.

(Criss aff. ¶ 11(d) and (e)).  Criss's own affidavit suggests that GE Capital independently

offered to complete the sale/leaseback transaction.  Even under Criss's legal

interpretation of section 1(b)(5), an "event" occurred to trigger Chart's call option.

Finally, Criss contends S.C. Code Ann. § 33-8-310 applies to Chart's call of his

shares.  This section addresses directors' conflict of interest transactions with a

corporation.  Criss contends this statute applies because Chart LP will benefit from the

transaction by becoming the sole shareholder.  However, the statute provides that a

"conflict of interest transaction is not voidable by the corporation solely because of the

17

director's interest in the transaction if . . . the transaction was fair to the corporation."

§ 33-8-310(a)(3).  Criss apparently argues the transaction is unfair to him, but provides

no reason why the call of his shares is unfair to Wencoast.  This transaction is no

surprise, nor unexpected, since it is detailed in the Call Option Agreement signed by both

Criss and Chart LP.  Since both parties agreed to the transaction, and Criss points to no

reason why Wencoast is harmed by the call, the court finds the transaction is fair to

Wencoast.  Chart's motion for partial summary judgment regarding its rights under

section 1(b)(5) of the Call Option Agreement is granted.

## III.     CONCLUSION

The court will schedule a conference with the parties to address implementation

of this Order and remaining issues.  In the meantime, Judge Blatt's Order remains in

effect in its entirety.

For the foregoing reasons, it is therefore **ORDERED:**

a.      Chart's motion to dismiss, document no. 59 in 05-1650, is **GRANTED** in

         part and **DENIED** in part;

b.      Criss's motion for partial summary judgment as to corporate governance,

         document no. 56 in 05-1650 and document no. 57 in 05-1651, is

         **GRANTED**;

c.      The court withholds resolution of Chart's motion to amend, document no.

         58 in 05-1650 and 05-1651, pending discussion with the parties;

d.      Chart's motion for partial summary judgment as to corporate governance,

         document no. 61 in 05-1650 and document no. 59 in 05-1651, is

**DENIED**;

e.      Criss's motion for partial summary judgment as to the Termination Call

Option, document no. 74 in 05-1650 and document no. 72 in 05-1651, is

**DENIED**;

f.      Chart's motion for partial summary judgment as to the Call Option

Agreement, document no. 84 in 05-1650 and 05-1651, is **GRANTED**.[7]

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**


**February 28, 2006**
**Charleston, South Carolina**

---

[7] Document no. 32 (Chart's initial motion to dismiss) in 05-1650 was rendered moot by document no. 59.  Documents no. 48 and 49 (Chart's motion to show cause) in 05-1650 and 05-1651 were denied in an October 12, 2005 Order.  Document no. 66 (Criss's motion for a preliminary injunction) in 05-1651 was denied in an October 12, 2005 Order.